[Cite as *State v. Torres*, 2013-Ohio-5030.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No.   99596

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## RAMON TORRES

DEFENDANT-APPELLANT

## JUDGMENT:
### AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-555805

**BEFORE:**  Boyle, J., Stewart, A.J., and McCormack, J.

**RELEASED AND JOURNALIZED:**  November 14, 2013

**ATTORNEY FOR APPELLANT**

Patricia J. Smith
4403 St. Clair Avenue
The Brownhoist Building
Cleveland, Ohio   44103

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Denise J. Salerno
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

**{¶1}** Defendant-appellant, Ramon Torres, appeals his convictions and sentence.

He raises three assignments of error for our review:

> 1. The trial court erred when it failed to give an adequate "other acts" instruction, gave an unfairly prejudicial flight instruction over objection, failed to give a properly requested appropriate eye-witness identification instruction and over objection gave an improper accomplice instruction.
>
> 2. The trial court erred when it sentenced the appellant unfairly disproportionately to that of the co-defendant.
>
> 3. The jury clearly lost its way in finding the appellant guilty of the charges where the weight of the evidence is against a finding of guilty.

**{¶2}** Finding no merit to his appeal, we affirm.

<u>Procedural History and Factual Background</u>

**{¶3}** Torres was indicted, with codefendant Pierre Chatmon, in November 2011, on 15 counts: one count of aggravated murder in violation of R.C. 2903.04(A); two counts of murder in violation of R.C. 2903.02(B); ten counts of felonious assault in violation of R.C. 2903.11(A)(2); one count of improperly discharging a firearm into habitation in violation of R.C. 2923.161(A)(1); and one count of having a weapon while under a disability in violation of R.C. 2923.13(A)(3). All of the counts carried three-year firearm specifications except discharging a firearm into habitation and having a weapon while under a disability. Torres waived his right to a jury on the count of having a weapon while under a disability. The remaining counts were tried to a jury, where the following facts were presented.

**{¶4}** Cherease Williams, mother of 16-year-old J.S. (the victim), testified that on September 19, 2011, J.S. called her at work around 12:45 p.m. when he got home from school. J.S. told Cherease "they broke into our house; everything is gone." Cherease lived on Denison Avenue at the corner of Denison Avenue and West 95th Street in Cleveland, in the bottom-floor apartment. The house was three stories, with two other apartments above Cherease's. Cherease left work immediately. When she arrived home, J.S. was there with his girlfriend, Breonna Hawkins, and his friend, Domiate Johnson. Cherease said that her house had been "ranshacked" and that her television, laptop, children's games and gaming systems, clothes, cameras, and more had been taken. At some point, Cherease's other children, Lashawna, Melvin, and Ronrico Williams, arrived at her house.

**{¶5}** Cherease learned from one of J.S.'s friends that James Davis and Dooney Jordan were responsible for burglarizing her home. Cherease did not know the Jordans at that time, but she decided to go to the Jordans' house to talk to Theresa Jordan, Dooney's mother. They all went to the Jordans' house, which was just down West 95th Street; Cherease, Lashawna and Breonna drove in Cherease's car, and J.S., Domiate, Melvin, and Ronrico walked.

**{¶6}** Cherease confronted Theresa, telling Theresa that she heard Dooney had burglarized her home. Theresa got angry with Cherease and began yelling at her. Soon after that, Dooney arrived on his bicycle, and a fight broke out between everyone, including Cherease and Theresa.

{¶7} After the fight ended, J.S., Domiate, Melvin, and Ronrico began walking back to Cherease's house. Cherease, Lashawna, and Breonna got back in Cherease's car to drive back. A red four-door Alero pulled up in front of Cherease's car with two men in it. According to several witnesses, one of them was black and one was "Puerto Rican" or "Hispanic." Cherease saw both men get out of the car. Cherease further testified that she saw one of the men, who she later identified as Torres, "gesture like he had a gun."

{¶8} Breonna testified that she saw the red car "fly by them" as they were still standing in the Jordans' driveway. She stated that "the boys start running" and she, Cherease, and Lashawna got into Cherease's car. She saw the red car stop at a stop sign in front of them. She said that "two people hopped out of the car." She described the driver as "tall" and "like, light-skinned Puerto Rican." She described the passenger as short and "brown skin black."

{¶9} Lashawna testified that as she, Cherease, and Breonna were sitting at a stop sign, she saw "a red car had just cut in front of [them] and stopped." She said that "two guys hopped out," and they went running toward Melvin and Ronrico. Although Lashawna did not see who was driving, she described the men as "black, African American and Latino, Puerto Rican."

{¶10} Domiate said that he saw a "light-skinned" male get out of the driver's seat of the red car, but he could not see the man's face. Domiate did not see anyone else get out of the red car.

{¶11} Ronrico described the driver of the red car as a "light-skinned guy, Hispanic." Ronrico did not see the passenger. Ronrico later identified Torres in a photo array as the Hispanic man he saw "pull up" in the red car.

{¶12} Melvin testified that the passenger of the red car got out of the vehicle and that he and the passenger "had a couple words." Melvin said, "we threw our guards up." Melvin stated that the passenger acted "like he had a gun," so Melvin "took off running." Melvin said that once he began running away, he heard gunshots. Melvin described the passenger as "African American, short, about five-six, five-seven, a little stocky." Melvin described the driver as "Dominican, Puerto Rican." Melvin did not "pay attention" as to whether the driver got out of the red car. When they got back to Cherease's house, Melvin left with Ronrico.

{¶13} Cherease called 911 at 2:44 p.m. to report the burglary. She wrote a list of her missing property to give to police. As they were "wrapping it up," Cherease saw one of the Jordans drive by her house. She told the officer that "was one of the guys * * * we got into a fight with right there." Cherease said that the police officer noted that the bar across the street, Andy's Hot Spot, had video cameras out front and said that the cameras might have captured the burglary.

{¶14} Cherease said that her friends, Kimberly Thomas and Monica Davis, came to her house. Cherease testified that in addition to herself, Kimberly, and Monica, Lashawna and her two children, Derrion and Derrick, were there, as well as J.S., Breonna, Domiate, and Dayvon (Cherease's youngest child). Cherease said that they were all

sitting on her front porch when a gold SUV pulled up with Jackie Jordan and James Grayhouse[1] in it. Jackie and James were Theresa Jordan's brother and sister. Jackie "was just going off about the fight." When Jackie and James left, they drove toward the Jordans' house. After they left, Cherease felt "[t]hreatened" and "scared."

{¶15} Cherease testified that as they were all sitting on her porch, she saw "all of these guys coming up the street" from the Jordans' home. Cherease said that she could "see right down their house from our porch." Cherease and everyone who had been sitting on her porch went inside because they were scared.

{¶16} Cherease testified that the "group" of men stopped outside of her house. They were across the street by the bar. They were "gesturing" and "walking back and forth." The men were telling whoever was inside to come out of the house. Cherease said that she was looking out her window the whole time. She said that some of the "group" were in front of the bar, some were in the street. Cherease stated that when the shooting began, she saw the shooter; she looked directly at him. Cherease testified that the shooter, who was standing at the side of the bar, was wearing jeans and had "a gray with red striped hoodie." Cherease further testified that the shooter had his "hood pulled up over his head," but she could see that "he was a Puerto Rican. He was the guy that I seen get out of that Alero earlier that day." She stated that she was "positive" because she "looked directly at him." She said that she saw the "Hispanic male pull a gun out and start firing, start shooting into my home."

_____

[1]In the transcript, James Grayhouse's name is also spelled James Greathouse.

{¶17} Cherease was on the phone with the 911 operator throughout the entire incident, explaining the events as they unfolded. She called 911 at 4:45 and 4:51 p.m. The 911 recording was played in court. Cherease explained to the 911 operator that "a whole bunch of guys" who were "supposed to be shooting my house" were coming up her street.[2] The 911 operator asked Cherease if she saw a gun. At that point, Cherease replied "no." Cherease then told the 911 operator, "they shooting, they shooting." Soon after that, Cherease is heard screaming on the recording, "they shot my baby." The 911 operator asked Cherease if she knew who it was; Cherease replied that she knew who it was, but that she did not know his name. She told the 911 operator that it was "a Puerto Rican" who shot her son, and that he was wearing a white and red jacket.

{¶18} Domiate testified that when he looked out the front window, he saw the "three Jordan brothers." But he did not see the shooting. When he heard gunshots, he dropped to the floor. Domiate heard a bullet hit the front door. Domiate saw J.S., who was by the front door, fall down. Domiate identified the three Jordan brothers, Keith, Kenneth, and Torrance, in separate photo arrays as being part of the group who were standing outside Cherease's house when the shooting occurred.

{¶19} Kimberly Thomas said that once the group outside started shooting, they did not stop; there was "consistent shooting." Kimberly stated that she was standing behind Cherease at the window, but she could still see outside. She explained that the "Spanish"

[2]Cherease was apparently referring to threats that Jackie Jordan made to Cherease earlier in the day when Jackie and James Grayhouse stopped by Cherease's house.

male "stood out" because everyone else was African American. Kimberly testified that the "Spanish" male had on a red and gray striped "hoodie," but everyone else was wearing dark-colored "hoodies." Kimberly saw the "Spanish" male point a gun at Cherease's house. When Kimberly saw that, she grabbed two of the children and ran to the bathroom. Kimberly identified Torres in court, but she said that she had never been shown a photo array.

{¶20} Breonna testified that there were two rounds of shooting. After the first round, Breonna said that she was standing near the window by Cherease. She saw a "tall male" with a hoodie. She saw him "look both ways" and start shooting at the house. She got down on the floor at that point. Breonna picked Torres out of a photo array nine days after the shooting. Breonna identified Torres in court as the shooter and as the man who she saw get out of the red Alero earlier that day.

{¶21} Lashawna testified that when she looked outside, she saw the black and Latino males that she had seen earlier in the day "when they hopped out of the car." Lashawna said that the black male was standing in the front of the bar, and the Latino was standing at the side of the bar. Lashawna heard gunshots, but did not see the shooting because she was keeping the children safe. She heard a loud boom that turned out to be her brother hitting the floor. Lashawna identified Torres in a photo array on September 30, 2011, as the person she saw get out of the red Alero and the person standing outside of her mother's house. Lashawna also identified Torres in court as that same man.

{¶22} Many other witnesses from outside of Cherease's house also testified. Stacy Bursey testified that she used to date James Grayhouse, who is Theresa Jordan's brother. Bursey stated that Pierre Chatmon's father is Theresa Jordan's other brother; James Grayhouse is Pierre's uncle. Bursey testified that earlier in the day on September 19, 2011, she was delivering telephone books in Aurora with James Grayhouse and George Dixon. Bursey said that when they were done, she dropped James Grayhouse and George Dixon off near the Jordans' home. When Bursey went back to pick them up, she saw them at the corner of Denison Avenue and West 95th Street. Bursey said that she yelled for Dixon, but he did not hear her. She started to turn left to get closer to Dixon when she heard gunshots. She turned to look and she saw "a light-skinned male" wearing "a gray hoodie, and Pierre * * * behind him." Bursey testified that she saw the light-skinned male shooting a gun. She saw Pierre reaching for a gun that was on the ground. She could not see the shooter's face because he had "a hoodie over his head," nor could she tell what race he was. Because she could not see his face, she could not identify the shooter.

{¶23} Bursey watched a surveillance video taken from the security cameras at the bar. She identified Kenneth and Torrence Jordan, James Grayhouse, George Dixon, Pierre Chatmon, and her van in the video.

{¶24} George Dixon testified that when Bursey dropped him and James Grayhouse off on West 95th Street, they walked to a bar with Grayhouse's nephews. Dixon saw a car pull behind the bar. He saw a "Puerto Rican" get out of the car. He also saw that

the Puerto Rican had a gun in his hand. Dixon heard gunshots from the front of the bar, but he did not see the shooting. Dixon later identified Torres in a photo array as the man he saw get out of the car with the gun in his hand. He identified Torres in court as the same man. Dixon said that he saw other "Puerto Ricans" get out of the car as well, but he could not identify them.

{¶25} Keith Jordan testified that he was charged with manslaughter and aggravated riot relating to the events that took place on September 19, 2011. He pleaded guilty to an amended indictment of aggravated riot in exchange for testifying truthfully against Torres. He had not yet been sentenced at the time of Torres's trial.

{¶26} Keith testified that he has three brothers, Kenneth, Terrance, and Torrance. He explained that "Dooney" is actually his cousin; his real name is Damian Grayhouse. Keith said that his mother obtained custody of Dooney when he was born. Keith refers to Dooney as his "little brother." Jackie Jordan is his mother's sister. Pierre Chatmon is Keith's first cousin. Torres is Keith's best friend.

{¶27} On September 19, 2011, Keith went to his mother's house after work. His mother and brothers were on his mother's front porch. His mother was bleeding. His brother, Terrance, was injured, as well as Dooney. Keith's family told him about the fight with the Williamses. They learned where the Williamses lived. Torrance, Kenneth, and Keith began walking toward the Williamses' house. As they were walking up the street, his uncle and his uncle's friend joined them. Keith could see a bunch of people on the Williamses' front porch. He saw them go inside the house. When Keith

got to the bar across from the Williamses' house, he noticed that Chatmon, Torres, and two other people were there who he did not know; one was Hispanic and one was African American. They came from the back of the bar and joined Keith and his group of people.

{¶28} Keith testified that as they were all standing in front of the bar, he received a text from his girlfriend. As he looked at it, he heard gunshots from behind him, but he never saw anyone with a gun. Keith took off "running down 95th." He said that everyone scattered, including Chatmon and Torres. After he started running, he heard more gunshots. He hid behind a tree. The police arrived and began chasing Torrance. Keith heard an officer "pull a gun" on Kenneth, so Keith stopped running. He turned around and told the officers that it was not them; "it's people up the street." Police placed him and his brothers in the back of a police car.

{¶29} The state played a surveillance video from the bar for Keith. Keith identified the silver car that he had seen that day that was parked in the back of the bar. He also identified Kenneth and Torrance, his uncle (James Grayhouse), his uncle's friend, Torres, and Chatmon in the video. He identified Torres as the one wearing a "hoodie," and said that he knew it was him because he saw him there. Even though Keith testified that he did not see anyone with a gun that day, he identified Chatmon as one of the men seen in the video pulling out a gun. Keith also identified Torres in a still photo taken from the surveillance footage.

{¶30} Kenneth and Torrance Jordan also testified. They also pleaded guilty to an amended indictment of aggravated rioting relating to the events that took place on September 19, 2011. They essentially told the same version of events as Keith. Kenneth testified that he left his mother's house and walked toward the Williamses' house with the intent to fight. Kenneth further stated that he was raising his hands to the people in the house as if to tell them to come out and fight. Kenneth also identified Torres in the surveillance footage from the bar and in still photos taken from the surveillance video.

{¶31} Paul Costello was driving down Denison Avenue when he saw a man shooting a gun "across [his] car." The man was African American and was wearing a black and green jacket. He said that he heard more shots and panicked because he thought, "man, we're right in the middle of it." He then heard someone yelling, "they killed him," so he turned around and parked his car to help.

{¶32} Steve Cotleur testified that he was at his girlfriend's house on the day of the shooting; she lives near Cherease Williams's house. He looked outside when he heard the shooting. He saw "three young kids run" to a red Alero and drive away from the scene.

{¶33} Jennifer Rosa, Torres's girlfriend, testified that she and Torres have a two-year-old child together. She stated that Torres and Keith Jordan are friends. Rosa and Torres lived together in 2011. When asked how Torres made a living, Rosa responded that he "sold drugs." Rosa said that she had a red four-door Oldsmobile Alero

that Torres would occasionally drive, but she could not remember if he drove it on September 19, 2011.

**{¶34}** Brian Willis testified that he was addicted to crack cocaine. He was in prison for breaking and entering at the time of Torres's trial. He stated that when he needed drugs, he would sometimes "rent [his] vehicle out for drug use." Willis explained that he meant that he would allow another person to use his car for "eight to twelve hours" in exchange for crack cocaine.

**{¶35}** Willis testified that in September 2011, he and his wife had possession of a silver Mazda 3 that they had rented from Hertz. Willis identified a photo of the silver Mazda in court; his blue cup was still in the console and some of his possessions were still in the trunk.

**{¶36}** Willis said that he would sometimes "rent the car out" to "Jay" for crack cocaine. "Jay" usually returned the car to him when he asked him for it. But sometime between September 6 and September 10, 2011, Willis "rented the car" to "Jay," and "Jay" did not return it as he had in the past. Willis picked Torres out of a photo array as the drug dealer he knew as "Jay." He then identified Torres in court as the same man.

**{¶37}** When police arrived at the scene, they discovered that the glass on the screen door of Cherease Williams's house had been shattered by a bullet. There were two bullet holes in the front door, one in the front porch of the second-floor apartment, and one in the front porch of the third-floor apartment. Police obtained three spent bullets — one from the front door of Cherease's house, one from the living room floor of

the third-floor apartment, and one that was removed from the victim, who died the day after the shooting.

{¶38} A police firearms expert testified that after examining the three spent bullets that were found, there were at least two guns, possibly three, that were fired. He said that two of the bullets could have been fired from the same gun because they were of similar diameter (one was a .38 caliber bullet and one was a .357 magnum caliber bullet). But he could not say for sure if they were fired from the same gun because the bullets were too damaged. The third bullet was also of similar diameter, but was fired from a different gun.

{¶39} Police collected two surveillance videos from Andy's Hot Spot, one from the back of the bar and one from the front of the bar. There is no sound to the videos. Detective Todd Staimpel viewed the videos within 30 minutes of receiving the radio call that shots had been fired. He said that he viewed the videos several times.

{¶40} Detective Staimpel then viewed the videos in court and described what he saw. From the front bar footage, a group of males could be seen gathering. The group appeared to be yelling things across the street. It then appeared in the video that shots had been fired because everyone scattered. From the back surveillance footage, a silver Mazda could be seen pulling into the bar parking lot, but only the front portion of the vehicle could be seen once it was parked. From the footage, one man could be seen getting out of the passenger side of the vehicle, but because of the angle of the car, no one else could be seen getting out of the car. Detective Staimpel explained that it appeared in

the video that "people from the car" joined up with other males walking toward the front of the bar. The vehicle then left the parking lot. One male was seen in the video loading what appeared to be a semiautomatic firearm. Another male, in what appeared to be a pink and grey "hoodie," was seen putting the hood over his head.

{¶41} Detective Staimpel learned that Torrance Jordan was in police custody in connection with the shooting. Detective Staimpel had also recognized Torrance on the surveillance video because he was familiar with the Jordan family and knew where they lived. When he arrived at the Jordans' house with other officers, the silver Mazda was parked in front of the house. Police discovered that the Mazda had been rented by a woman in Parma, so they towed it.

{¶42} Detective Jamaal Ansari, the lead detective on the case, testified that he learned from talking to witnesses in Cherease Williams's house there were two shooters — one Hispanic male wearing a "red and gray hoodie" and an African American male "wearing green and black." He learned from Cherease Williams that the Hispanic male was associated with the Jordan family. He discovered from reviewing Keith Jordan's file that Torres, a Hispanic male, was associated with Keith. So based on a "hunch," Detective Ansari prepared a photo array of six Hispanic men that included Torres. He asked Cherease, Breonna, and Lashawna to come to the station. All three individuals selected Torres out of the photo array.

{¶43} Detective Ansari ran Torres's information through the Cleveland Municipal Court and discovered that he had a 2011 citation while driving an Alero (although the

report did not state what color the vehicle was). Torres informed police in an interview that his girlfriend owned a red Alero. Torres told police that he drove the Alero sometimes.

{¶44} Detective Ansari also discovered who owned the silver Mazda; it was Willis's girlfriend. Willis identified Torres in a photo array as being his drug dealer, Jay. When Detective Ansari showed Torres a picture of the silver Mazda, Torres said that it "belonged to a fiend." Detective Ansari said that "fiend" meant "drug addict." When shown a picture of Willis, Torres said "that's the fiend I served."

{¶45} Detective Ansari testified that Torres admitted that he knew Keith Jordan and that he had been to the Jordans' house earlier in the day on September 19, 2011, but it was before noon. Torres denied being involved in the shooting.

{¶46} Police never found any forensic evidence that connected Torres to the silver Mazda. They did find DNA of two other Hispanic males in the silver Mazda, DNA from a red sweatshirt that belonged to Miguel Hernandez, and a thumb print from Andre Rodriguez. Detective Ansari testified that he looked up the Bureau of Motor Vehicle photos of the men. Hernandez had a much darker complexion, was heavy set, and looked older than Torres. Rodriguez was "darker, almost African American in complexion." He was able to find Hernandez, but was not able to prove that Hernandez was at the scene. He was never able to locate Rodriguez.

{¶47} The jury found Torres not guilty of aggravated murder in Count 1, but guilty of the lesser-included offense of involuntary manslaughter with the three-year firearm

specification. The jury also found Torres guilty of both counts of murder under R.C. 2903.02(B) with the three-year firearm specifications; guilty of nine counts of felonious assault with the three-year firearm specifications, but not guilty of one count of felonious assault; and guilty of improperly discharging a firearm into habitation. The court found Torres guilty of having a weapon while under a disability.

{¶48} Prior to sentencing, the trial court merged the counts of involuntary manslaughter, murder, the felonious assault count related to J.S., and improperly discharging a firearm into habitation. The state elected to proceed on the murder count under Count 2. The trial court sentenced Torres to a total of 24 years to life in prison — 15 years to life, plus three years for the firearm specification for murder; five years on each of the remaining felonious assault counts, all to run concurrent to each other and consecutive to Count 2; and one year for having a weapon while under a disability, to be served consecutive to all other counts. The trial court further notified Torres that he would be subject to a mandatory term of five years of postrelease control upon his release from prison. It is from this judgment that Torres appeals.

## Jury Instructions

{¶49} In his first assignment of error, Torres argues that the trial court erred when it instructed the jury. He challenges four instructions that the trial court gave to the jury: (1) the "other acts" instruction; (2) the flight instruction; (3) the eyewitness identification instruction; and (4) the accomplice instruction.

**{¶50}** When instructing the jury, a trial court is required to provide "a plain, distinct, and unambiguous statement of the law applicable to the evidence." *State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 73, citing *Marshall v. Gibson*, 19 Ohio St.3d 10, 12, 482 N.E.2d 583 (1985). "A jury instruction is proper where '(1) the instruction is relevant to the facts of the case; (2) the instruction gives a correct statement of the relevant law; and (3) the instruction is not covered in the general charge to the jury.'" *State v. Walker*, 8th Dist. Cuyahoga No. 97648, 2012-Ohio-4274, ¶ 53, quoting *State v. Kovacic*, 11th Dist. Lake No. 2010-L-065, 2012-Ohio-219, 969 N.E.2d 322, ¶ 15.

**{¶51}** Trial courts have broad discretion in determining whether the evidence adduced at trial was sufficient to warrant a jury instruction. *State v. Mitts*, 81 Ohio St.3d 223, 228, 690 N.E.2d 522 (1998). "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Sims*, 8th Dist. Cuyahoga No. 85608, 2005-Ohio-5846, ¶ 12, citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). "Abuse of discretion" has been described as a ruling that lacks a "sound reasoning process." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

A. The "Other Acts" Instruction

**{¶52}** In this case, the state requested the trial court to give the jury an other-acts evidence instruction. The state argued that the jury had been informed that Torres was a drug dealer. The state indicated that "the jury needs to be warned that — not to use that as a judge of his character, whether he does other bad acts, but rather as to a connection to the ID of the shooter in this case."

**{¶53}** Torres argues that the trial court erred in giving the instruction over his objection, claiming that "[i]t is trial strategy[;] [i]t is entirely plausible that the appellant did not wish to draw even further notice to the evidence of his alleged drug dealing." Torres maintains that the instruction was unfairly prejudicial. The trial court instructed the jury:

> There was also some other acts of the defendant that were testified to. Evidence was received about the commission of crimes, wrongs or acts other than the offense for which the defendant is charged with in this trial. That evidence was received only for a limited purpose. It was not received and you may not consider it to prove character of the defendant or to show that he acted in conformity with that character. If you find that the evidence of other crimes, wrongs or acts is true and that the defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves, A, the identity of a person who committed the offense in this trial; or B, that evidence cannot be considered for any other purpose.

**{¶54}** Evidence of other acts, although they are crimes, is admissible for various purposes such as identity. Evid.R. 404(B). Two witnesses testified to the fact that Torres was a drug dealer — Willis and Rosa. Willis's testimony was essential to establishing that Torres had access to and possession of the silver Mazda that was shown in the surveillance video driving into the parking lot behind Andy's Hot Spot, and then

immediately leaving after people got out of the car and walked to the front of the bar — where the shooting took place. The silver Mazda is then found at the Jordans' residence soon after the shooting. Rosa's testimony that Torres was a drug dealer corroborates Willis's testimony. Thus, Willis's and Rosa's testimony was an integral part of proving Torres's identity and involvement in the shooting.

B. The Flight Instruction

{¶55} Torres maintains that he, "along with every other person on the street that day[,] ran at the sound of gunshots." He argues that by giving the flight instruction, over his objection, the jury would not consider "fleeing for one's own safety as a factor to weigh when deciding guilt." The trial court instructed the jury:

> Let's talk about the concept of flight of the defendant. Testimony has been admitted indicating that the defendant fled the scene. You are instructed the fact that the defendant has fled the scene does not raise the presumption of guilt, but may tend to indicate the defendant's consciousness of guilt. If you find that the facts do not support that the defendant fled the scene or if you find that some other motive prompted the defendant's conduct or if you are unable to decide what the defendant's motivation was then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by a consciousness of guilt you may or may not — you may but are not required to consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give this evidence.

{¶56} We find no abuse of discretion on the part of the trial court. Flight from justice "means some escape or affirmative attempt to avoid apprehension." *State v. Spraggins*, 8th Dist. Cuyahoga No. 99004, 2013-Ohio-2537, ¶ 24, citing *State v. Benjamin*, 8th Dist. Cuyahoga No. 80654, 2003-Ohio-281. It is not error for a trial court

to give a flight instruction when there is such evidence. *Id.* As Torres points out, evidence was given at trial that he, along with everyone else, fled the scene. But the trial court informed the jury that it could determine from the evidence if the defendant fled the scene for some other purpose. Thus, the jury could have decided if Torres fled because he was trying to avoid the police or if he fled for safety reasons to avoid being shot. Accordingly, we find no error.      C. The Eyewitness Identification Instruction

{¶57} Torres maintains that in this case the "central issue was identification." He argues that "the eyewitness identification came from several victims who were inside the house at the time of the shooting. Those eyewitnesses were African American. [And] [he] is Hispanic." Because of this, he requested the court to give the jury a cross-racial identification instruction. Instead, the trial court instructed the jury using Ohio's standard instruction regarding eyewitness identification. He argues that this instruction was inadequate and caused undue prejudice to his case. The trial court instructed the jury on eyewitness identification as follows:

> Another specific instruction that we are giving in this case deals with eyewitness testimony. Some things you may consider in weighing the testimony of identity witnesses are the following. You may consider these. One, the capacity of the witness — that is, the age, intelligence, defective senses, if any, and the opportunity of the witness to observe. You may also consider the witness's degree of attention at the time he or she observed the offender. You may also consider the accuracy of the witness's prior description or identification, if any. You may also consider whether the witness had occasion to observe the defendant in the past. You may also consider the interval of time between the event and the identification. You may also consider all surrounding circumstances under which a witness has identified the defendant including deficiencies, if any, in the lineup, photo display or one-on-one identification. If after examining the testimony of an identifying witness you are not convinced beyond a reasonable doubt that

the defendant is the offender, you must find the defendant not guilty. Of course, the flip side of that is after examining the testimony of the identifying witness you are convinced beyond a reasonable doubt that the defendant is the offender you must find the defendant guilty.

**{¶58}** Torres requested that the trial court give a cross-racial eyewitness identification instruction similar to that which was requested by the defendant in *State v. Cromedy*, 158 N.J. 112, 727 A.2d 457 (1999). In *Cromedy*, the defendant requested the following instruction be given:

> [Y]ou know that the identifying witness is of a different race than the defendant. When a witness who is a member of one race identifies a member who is of another race we say there has been a cross-racial identification. You may consider, if you think it is appropriate to do so, whether the cross-racial nature of the identification has affected the accuracy of the witness's original perception and/or accuracy of a subsequent identification.

*Id.* at 118.

**{¶59}** The trial court refused to give the instruction, which the intermediate appellate court upheld. *Id.* at 118-199. The New Jersey Supreme Court reversed, holding that the trial court erred by not giving the cross-racial identification instruction. *Id.* at 132-133.

**{¶60}** In *Cromedy*, the New Jersey Supreme Court thoroughly examined and reviewed 40 years of "empirical studies concerning psychological factors affecting eyewitness cross-racial or cross-ethnic identifications." *See id.* (for an extensive discussion on social science studies and how courts across the country have addressed the issue). Ultimately, the Supreme Court of New Jersey "embrace[d] the California rule requiring a cross-racial identification charge," concluding that:

A cross-racial instruction should be given only when, as in the present case, identification is a critical issue in the case, and an eyewitness's cross-racial identification is not corroborated by other evidence giving it independent reliability. Here, the eyewitness identification was critical; yet it was not corroborated by any forensic evidence or other eyewitness account. The circumstances of the case raise some doubt concerning the reliability of the victim's identification in that no positive identification was made for nearly eight months despite attempts within the first five days following the commission of the offenses. Under those circumstances, turning over to the jury the vital question of the reliability of that identification without acquainting the jury with the potential risks associated with such identifications could have affected the jurors' ability to evaluate the reliability of the identification. We conclude, therefore, that it was reversible error not to have given an instruction that informed the jury about the possible significance of the cross-racial identification factor, a factor the jury can observe in many cases with its own eyes, in determining the critical issue — the accuracy of the identification.

*Id.* at 132-133.

**{¶61}** Although identification was a critical issue in this case, there were several witnesses who identified Torres in a photo array (which Torres does not challenge) as the shooter or at least as one of the men standing outside of Cherease's house — not just one eyewitness as in *Cromedy*. Three of the witnesses, Lashawna, Cherease, and Breonna, separately picked Torres out of the photo array — 11 days after the shooting, not eight months as in *Cromedy*. All three of these witnesses testified that they had seen Torres get out of the red Alero earlier that day when they left the Jordans' house after the fight. Lashawna saw Torres standing outside of Cherease's house with a gun; Cherease and Breonna actually saw Torres shoot the gun at her house.

**{¶62}** Cherease's 911 call was played for the jury. As the events were unfolding, she told the 911 operator that she could see who was shooting at her house. She stated

that she knew who shot her son; "a Puerto Rican shot my son." She said she saw the shooter; she looked directly at him. She testified that she never moved from that window. She further testified that "[h]e was the guy that I seen get out of that Alero earlier that day." She stated that she was "positive" because she "looked directly at him."

{¶63} Breonna testified that when standing behind Cherease at the front window, she saw a "tall male" with a hoodie. She saw him "look both ways," and start shooting the house again. She got down on the floor at that point. Breonna picked Torres out of a photo array 11 days after the shooting. Breonna identified Torres in court as the shooter and as the man who she saw get out of the red Alero earlier that day.

{¶64} Lashawna testified that when she looked out Cherease's front window, she saw the black and Latino males that she had seen earlier in the day "when they hopped out of the car." The black male was standing in the front of the bar, and the Latino was standing on the side of the bar. Lashawna identified Torres in a photo array 11 days after the shooting as the person she saw get out of the red Alero and as one of the men standing outside of her mother's house.

{¶65} Further, Kimberly Thomas stated that when she was standing behind Cherease at the front window, she could still see the group of men outside. She said that the "Spanish" one stood out, because everyone else was African American. She based her response on "skin tone." She said the "Spanish" one had on a red and gray striped "hoodie," but everyone else was wearing dark-colored "hoodies." She saw the "Spanish"

one point a gun at Cherease's house. When the shooting started, Thomas ran to the bathroom.

{¶66} Moreover, there was also other substantial evidence that corroborated the eyewitnesses' identification. Willis testified that Torres had never returned the silver Mazda that he had "rent out" to him one or two weeks before the shooting; the Mazda is seen on the surveillance video pulling behind the bar right before the shooting. Further, police learned that Torres did, in fact, drive his girlfriend's red Alero, corroborating the eyewitnesses' testimony that they had seen Torres get out of a red Alero earlier that day.

{¶67} The surveillance video footage shows what appears to be a group of males come from where the silver Mazda was parked. One male is seen in the video loading what appears to be a semiautomatic firearm. Another male, in what appears to be a pink and grey "hoodie," is seen putting the hood over his head. Several witnesses, including Cherease who saw the Hispanic male shoot a gun toward her house, described him as wearing a grey and red "hoodie," with the hood pulled over his head.

{¶68} The three Jordan brothers all testified that Torres and Chatmon were at the bar when they arrived. Keith and Kenneth Jordan identified Torres in the video surveillance footage.

{¶69} Dixon saw a car pull behind the bar. He saw a "Puerto Rican" get out of the car. He also saw that the "Puerto Rican" had a gun in his hand. Dixon heard gunshots from the front of the bar. Dixon identified Torres in a photo array as the man he saw get out of the car with the gun in his hand.

{¶70} Stacy Bursey testified that although she could not see the shooter's face because he had "a hoodie over his head," she saw "a light-skinned male" wearing "a gray hoodie, and Pierre * * * behind him." She could not say what race the light-skinned male was. She saw the light-skinned male shooting a gun, and she saw Pierre reaching for a gun that was on the ground.

{¶71} This was simply not a factual situation like the court in *Cromedy* faced. Accordingly, we find no abuse of discretion in the trial court's decision to use Ohio's standard eyewitness identification instruction and not charge the jury with a cross-racial identification instruction.

D. The Accomplice Instruction

{¶72} Torres further argues that the trial court erred when it gave an accomplice instruction. He maintains that without this instruction, the testimony of the three Jordan brothers actually helped him — because although they placed Torres at the scene, they stated that they did not see him with a gun. The trial court instructed the jury, over Torres's objection, as follows:

> I would also like to talk about the testimony of alleged accomplices. You have heard the testimony from an alleged accomplice or at least a person who pled guilty to a offense involved in this incident. An accomplice is one who purposely or knowingly assists or joins another in the commission of a crime. Whether he was an accomplice and the weight to give his testimony are matters for you to determine from all of the facts and circumstances. Testimony of a person whom you find to be an accomplice should be viewed with grave suspicion and weighed with great caution. The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude or through self interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion and require to be weighed with great

caution. So it is for you as jurors in light of all the facts presented to you from the witness stand to evaluate such testimony and to determine its quality or worth or lack of quality or worth.

**{¶73}** This court has held that "[t]rial courts are required to give a special jury instruction in situations where there is some evidence of complicity and an accomplice testifies against the defendant." *State v. Pagan*, 8th Dist. Cuyahoga No. 97268, 2012-Ohio-2197, ¶ 26, citing *State v. Jones*, 8th Dist. Cuyahoga No. 88203, 2007-Ohio-1717, ¶ 30. We further noted that "the failure to give the cautionary instruction can amount to plain error because the accomplice instruction is required to be given by law." *Id.* at ¶ 28, citing *State v. Lett*, 160 Ohio App.3d 46, 2005-Ohio-1308, 825 N.E.2d 1158 (8th Dist.); *Jones*; and *State v. Pope*, 8th Dist. Cuyahoga No. 81321, 2003-Ohio-3647.

**{¶74}** In this case, there was "some evidence" that the three Jordan brothers were accomplices to Torres and Chatmon. Chatmon was related to the Jordans, and Torres and Keith Jordan were best friends. This whole incident arose because Cherease and her family went to Theresa Jordan's home to confront her and accuse her nephew, who Theresa had custody of since he was a baby, of burglarizing Cherease's home. A fight broke out between the Williamses and the Jordans. Immediately after the fight, as the Williamses were leaving the Jordans' house, Torres and Chatmon pulled up in the red Alero and exchanged words with the Williams brothers.

**{¶75}** Then, a couple of hours later, the three Jordan brothers walked down the street to Cherease Williams's house, with the intent to fight. Torres and Chatmon just

happened to arrive at the bar across the street from Cherease's house at the exact same time with guns in hand.

**{¶76}** This evidence is sufficient to warrant the accomplice instruction, even if the three Jordan brothers only pleaded guilty to aggravated riot.

**{¶77}** Accordingly, Torres's first assignment of error is overruled.

<u>Sentence</u>

**{¶78}** In his second assignment of error, Torres argues that the trial court erred when it sentenced him to more time than it sentenced Chatmon, who only received 18 years to life in prison; Torres received 24 years to life in prison. He maintains that he was no more culpable than Chatmon, especially when — as he asserts — Chatmon "was actually on the video firing the weapon into the home."

**{¶79}** We note at the outset of this argument that the video does not show Chatmon firing a gun into Cherease's home. It shows Chatmon loading and holding a gun, but not firing it.

**{¶80}** R.C. 2953.08(G)(2) states that when reviewing felony sentences "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion." Rather, the statute states that if we "clearly and convincingly" find that (1) "the record does not support the sentencing court's findings under [various sentencing provision not relevant here]," or that (2) "the sentence is otherwise contrary to law," then we "may increase, reduce, or otherwise modify a sentence * * * or [we] may vacate the

sentence and remand the matter to the sentencing court for re-sentencing." *State v. Goins*, 8th Dist. Cuyahoga No. 98256, 2013-Ohio-263, ¶ 6, quoting R.C. 2953.08(G)(2).

{¶81} R.C. 2929.11(B) provides that

A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders.

{¶82} R.C. 2929.11(B) directs that the trial court impose a sentence "consistent with sentences imposed for similar crimes committed by similar offenders." Sentencing in Ohio, however, is not accomplished according to a tightly controlled grid system similar to federal sentencing guidelines. *State v. Dawson*, 8th Dist. Cuyahoga No. 86417, 2006-Ohio-1083, ¶ 31. Rather, an appellate court must examine the record, not to decide whether the trial court "imposed a sentence that is in lockstep with others, but whether the sentence is so unusual as to be outside the mainstream of local judicial practice. Although the offenses may be similar, distinguishing factors may justify dissimilar treatment." *Id.*

{¶83} Moreover, although there is a statutory mandate for consistency in sentencing, "consistency does not require that identical sentences be imposed for co-defendants." *State v. Harder*, 8th Dist. Cuyahoga No. 98409, 2013-Ohio-580, ¶ 7, and *State v. Drobny*, 8th Dist. Cuyahoga No. 98404, 2013-Ohio-937, ¶ 7, both quoting *State v. Pruitt*, 8th Dist. Cuyahoga No. 98080, 2012-Ohio-5418. Sentences should not be "one size fits all."

**{¶84}** If the record established that the trial court failed to ensure that Torres's sentence was "consistent with sentences imposed for similar crimes committed by similar offenders," then his sentence would be contrary to law. In determining this, however, we presume that "the sentence imposed by the trial court is correct absent evidence that it is clearly and convincingly contrary to law." *State v. Sherman*, 8th Dist. Cuyahoga No. 97840, 2012-Ohio-3958, ¶ 15, citing *State v. Edwards*, 8th Dist. Cuyahoga No. 82327, 2003-Ohio-5503, ¶ 32.

**{¶85}** The state requested that Torres be sentenced to more time than Chatmon because "the evidence bore out that Mr. Ramon Torres was in fact the shooter who was shooting into the house when [the victim] was hit and killed." The state requested that Torres receive 18 years to life in prison for the murder, and eight years for each felonious assault charge. The state explained that Chatmon "came in this courtroom and apologized and took some responsibility for his actions. There's been no signs of remorse here." The state further noted that "[t]here's been no acknowledgement of his participation. And you seen that throughout this trial. You seen that in his interview with the detective. You never spoke about that incident. Actually was yawning during that entire interview process." The state further highlighted that Torres acted "disinterested" in court as well. The trial court indicated that it had also noticed Torres's actions in the interview process and in court.

**{¶86}** Torres's defense counsel responded to the state's request:

> We would submit respectfully that we certainly acknowledge the jury's findings in this case. We would however, submit that our client's

culpability was no greater than that of Pierre Chatmon. We have advised him not to make a statement at this time because of his appellate rights. But we would ask the court to consider the fact that his record is less extensive than that of Pierre Chatmon going into the case. And again, his involvement does not appear to be more culpable than that of his codefendant. We would submit that based on the proportionality argument, his sentence should be no greater than this of his codefendant. And we would ask the court to impose a sentence of 18 to life.

{¶87} The trial court stated that it "sat through this trial twice[,] [and] listened to the testimony of 28 witnesses at least twice." The trial court then stated:

And I have come to the actual certain position that you were involved in this. I will accept this jury's verdict. But I would have convicted you of aggravated murder with prior calculation and design in Count 1, because I think there's not much doubt at all that you were the person that shot the bullet that was retrieved from the victim's head. Because we know Pierre Chatmon was firing a semiautomatic weapon because that was captured on videotape.

Your position here, as noted by the state of Ohio, is somewhat offensive to the court. You have at no time during this process demonstrated any remorse. You have at no time at the process accepted responsibility. You have at no time apologized to the family of the victim for your involvement in this horrendous act.

You had a number of attorneys to represent you. Your first attorneys filed a notice of alibi. You were telling them that you were somewhere else. That's until you found out that you were caught on videotape.

Your codefendants in this case — or I should say — let me be very specific about this. The individuals who were charged with, I believe, manslaughter or an aggravated riot, who testified against you, clearly put you at the scene. You're seen on video at the scene. You're seen with the other people who identified you at the scene.

I do recall the very interview that the state of Ohio referenced, which was your interview with Cleveland Police Detective Jamaal Ansari, doing a fabulous job, got it on videotape. And you, a person who is being questioned for an aggravated murder, who could go to prison for the rest of their life, you had a hard time staying awake. You appeared to kickback

and [be] yawning.  It was all a bore.  You were being cool.  All captured on videotape for the jury to see as you yawned your way through portions of this trial.

I'm surprised with all the amount of time you have to sleep in the county jail that you're tired.

Then I came out here today, and before the state of Ohio called the court's attention to your demeanor, I noticed that you thought today was sort of funny.  You had a smile on your face.

I think anybody who has sat through this proceeding, anybody with a lick of common sense, with any objectivity whatsoever, comes to the inescapable conclusion that the jury absolutely got it right in this case.  And there are two people in the back of the courtroom, and I've delayed the sentencing so your father could be here, who knows or should know exactly what I'm talking about on this point.

You know, this has been a tragedy, not only for the victim's family and the entire community, but also for your father and your mother and your family and your girlfriend.  I don't know if you have children.  And this is all because of the decisions that you made, that you continue to make, and that you as of yet have absolutely taken no responsibility for whatsoever.  So that's how I begin my analysis of your sentencing.

{¶88} The trial court went on to review Torres's criminal history, which was extensive, and reviewed the facts of the case.

{¶89} After review, we find that the record does not clearly and convincingly establish that Torres's sentence was contrary to law.   Indeed, the record establishes that the trial court — which sat through both Torres's and Chatmon's trials — considered and applied the proper statutory factors when sentencing Torres.

{¶90} Accordingly, Torres's second assignment of error is overruled.

## Manifest Weight of the Evidence

**{¶91}** In his third assignment of error, Torres contends that his convictions were against the manifest weight of the evidence.

**{¶92}** In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. When reviewing a claim challenging the manifest weight of the evidence, "the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. After reviewing the entire record, the reviewing court must

> weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Id.*

**{¶93}** Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies

and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

**{¶94}** Torres claims that his convictions are against the manifest weight of the evidence because there was no physical evidence tying him to the shooting of J.S. He further argues that "[a] review of the evidence will indicate how incredible the various witness statements were." He asserts that "[e]ven giving due deference to the fact-finder, it must be determined that this verdict is against the manifest weight of the evidence."

**{¶95}** After a review of the record, we find that Torres's convictions are not against the manifest weight of the evidence. Although there was no forensic evidence to tie Torres to J.S., substantial testimonial and circumstantial evidence exists to justify the jury's verdict as we previously set forth in Torres's first assignment of error.

**{¶96}** Torres points to inconsistencies in the witnesses' testimonies regarding events that occurred on September 19, 2011, especially relating to the witnesses' identification testimony. For example, he argues that the mother of the victim stated that she never left the front window of her home, even as people were shooting at it. He maintains that this is incredible, because no one would stand in front of a shooting window. But Cherease is heard on the 911 recording telling the operator exactly what was happening as it unfolded. The jury was able to hear Cherease's voice on the recording, as well as her testimony in court, and determine her credibility.

**{¶97}** Torres further contends that it is unbelievable that Cherease could identify Torres from the front window because of the distance from her front window to the bar. But the jurors visited the crime scene. The jurors saw where Cherease's home was located in relation to the bar.

**{¶98}** Torres also argues that the witnesses' identification of him is suspect because the perpetrator was wearing a "hoodie." He points to Stacy Bursey's testimony — where she stated that she could not identify the shooter because he was wearing a "hoodie" and she could not see his face — as proof that the other witnesses could not have actually seen him. But that is simply not the case. The jury heard Bursey's testimony as to where her vehicle was located when she saw the shooters. Bursey did not have the same vantage point as the eyewitnesses in Cherease's house. Moreover, the jury was free to believe the witnesses from within the house who stated that they could identify Torres as one of the shooter's standing outside of Cherease's house.

**{¶99}** Finally, Torres's defense counsel did a very good job at pointing out all of the inconsistencies in the witnesses' testimonies, including differences and inconsistencies regarding Torres's skin color and race. Torres's defense counsel also made sure that the jury was aware that DNA from two other Hispanic individuals was found in the silver Mazda, from a sweater that was in the back seat and from a thumb print. But the jury was still free to believe that Torres was in the Mazda as well, despite the lack of forensic evidence proving that he was in the vehicle.

**{¶100}** Thus, after weighing all of the evidence and all reasonable inferences, considering the credibility of witnesses, and determining whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered, we conclude that it did not.

**{¶101}** Torres's third assignment of error is overruled.

**{¶102}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY J. BOYLE, JUDGE

TIM McCORMACK, J., CONCURS;
MELODY J. STEWART, A.J., CONCURS IN JUDGMENT ONLY