[Cite as *State v. Hill*, 2014-Ohio-387.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99819**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MARCUS HILL

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-568406

**BEFORE:** Rocco, J., Celebrezze, P.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** February 6, 2014

**ATTORNEY FOR APPELLANT**

John E. Castele
614 West Superior Avenue, Suite 1310
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Edward R. Fadel
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KENNETH A. ROCCO, J.:

{¶1} Defendant-appellant Marcus Hill appeals his convictions for felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony, and corresponding one-year and three-year firearm specifications. He contends that his convictions are against the manifest weight of the evidence. Having reviewed the record, we find no merit to Hill's appeal and affirm his convictions.

{¶2} Hill's convictions arose out of an October 24, 2012 shooting incident in the area of 2834 Washington Avenue in Cleveland. On November 13, 2012, Hill was indicted on six counts — three counts of attempted murder in violation of R.C. 2923.02 and 2903.02(A) and three counts of felonious assault in violation of R.C. 2903.11(A)(2). Each of the counts included one-year and three-year firearm specifications under R.C. 2941.141(A) and 2941.145(A), respectively, and a weapon forfeiture specification under R.C. 2941.1417(A). The counts identified three different victims, Lindsey Baldwin, Destiny Baldwin, and Anthony Donner. A codefendant, Dionta Willis ("Willis"), was indicted on the same charges. Both men waived their right to a jury trial, and on February 19, 2013, a bench trial commenced as to the charges against Hill and Willis.

{¶3} The state's witnesses, which included eyewitnesses Danielle Edwards ("Danielle"), her son and daughter, Lindsey ("Lindsey") and Destiny Baldwin ("Destiny"), and Nataia Ogletree, several police officers, and a forensic expert, provided

the following account of the incident and subsequent investigation that led to Hill's arrest and convictions.

**{¶4}** Danielle Edwards testified that on the evening of October 24, 2012, she received a telephone call advising her that a couple of neighborhood children were fighting at Linda's, a corner store located several minutes up the street from her apartment. After receiving the call, she ran out to the parking lot and jumped into her truck, intending to drive to the store to get her children, Lindsey and Destiny, whom she believed were also at the store. Danielle testified, however, that she never made it to the store. Before she left the parking lot, she saw her children and other kids from the neighborhood coming back towards the parking lot, so she turned around. As she was pulling her truck into a space in the parking lot, Danielle testified that she heard the children screaming, "Here they come. Here they come." Danielle testified that she got out of the truck and was approaching the walkway when she saw three young men — Hill, Willis, and T.Y. — running towards her children and Anthony Donner ("Donner"), who, by this time, were standing by a gate near the dumpster. Hill was in the front with Willis and T.Y. on either side of him. Although, at the time, Danielle did not know Hill by name, she testified that she recognized him from the neighborhood and that her children later told her his name. Danielle testified that she likewise knew Willis from the neighborhood and had previously spoken to him several times. She identified both men in the courtroom.

{¶5} Danielle testified that when she saw Hill and Willis, they were running and shooting in the direction of a large crowd of approximately 30 people, including Lindsey, Destiny, and Donner, who had gathered around the dumpster. Although it was evening, Danielle testified that the parking lot was brightly lit and that the neighboring buildings also had lights. Danielle testified that she was approximately the distance from the witness stand to the outside doors of the courtroom away from the boys when she first saw them shooting. She testified that she saw Hill and Willis each holding a gun and that, with respect to each, she saw "fire coming out of the gun" and "the fire come out they [sic] hand." She further testified that she heard five or six gunshots "hitting stuff," but that no one was hurt. After the shooting started, she ran to her apartment and called 911. The state introduced a recording of Danielle's 911 call. Approximately five minutes later, the police arrived, and Danielle went back out to the parking lot to talk with the police. Danielle testified that, after she spoke with the police for several minutes, Willis was apprehended. Willis was brought over to where Danielle was speaking with the police, and she identified him as one of the shooters.

{¶6} On cross-examination, Danielle testified that she had given two written statements to police — one that evening, immediately after the incident, and a second statement the following day. Danielle admitted that in the first statement she gave to police, she mistakenly indicated that there were "three shooters." At trial, she testified that she "wrote it wrong" and "meant to say it the other way," i.e., that although there were three boys, "only two of them was [sic] shooting." She testified that when she

wrote her initial statement, her hand was shaking and that she was "upset," "scared," and "horrified" as a result of the incident. As to her second statement, Danielle acknowledged that she did not mention in that statement that Willis had a gun, only that Hill had a gun. She testified that she did not indicate that Willis had a gun in her second written statement because (1) by that time, Willis was already in jail and (2) she had already included information regarding Willis's involvement in her first statement and "didn't know [she] had to put him in that statement, too." Danielle further acknowledged that she did not tell the 911 dispatcher the names of the individuals she believed were involved in the incident during her 911 call and that the information she provided the 911 dispatcher regarding what the individuals were wearing at the time of the shooting came from a third party.[1]

---

[1] It is not entirely clear from the record whether Danielle, in fact, failed to mention that Willis was one of the shooters in her second written statement to police. The statement was not admitted into evidence and, therefore, is not in the record. On re-direct examination, the prosecutor asked Danielle to read the following lines from her second statement, which suggests that Danielle may have actually indicated in that statement that Willis was shooting as well: "And Marcus was coming up Washington. Marcus lift his hand up once. They got by the office. And that's when he started shooting. And Dionta was beside him, and *they were* running towards all of us, *shooting*." (Emphasis added.)

Likewise, upon review of the recording of the 911 call, it does appear that Danielle told the 911 dispatcher that "Marcus" was involved. Danielle told the 911 dispatcher that she needed police assistance because "these guys that grabbed her son earlier, they just came back here shooting at us." When asked by the dispatcher, "what did they have on," Danielle turned to a boy named Marquel and asked him what the shooters were wearing. She then told the dispatcher "it was Marcus." Danielle is heard asking, "who else," apparently attempting to get the names of the others involved from those nearby, but then yells, "they coming back," and the call ends abruptly.

{¶7} The 911 call Danielle made relating to the incident was one of three 911 calls she made the day of the incident.   Danielle testified that she first called police after her son, Lindsey, "got jumped on" at the local recreation center earlier that afternoon. Danielle testified that, according to Lindsey, Hill was one of the participants in the beating, having held Lindsey down while others beat him up.   She called 911 a second time "when the same guys that held [Lindsey] down and jumped on him came back up there to try and jump him again," and, a third time, after the shooting began.

{¶8} Danielle's 14-year-old daughter, Destiny Baldwin, also testified.   Destiny testified that on the evening of the incident, she saw Hill and Willis at the corner store. She testified that she had been at the store with her brother, Lindsey, his friend, Donner, and several others watching Hill and another boy, Marquel, fighting.   After the fight, they walked back to their house on Washington Avenue.   She testified that a few minutes after the fight, she, Lindsey, and Donner were "up the hill" near the garbage can by her house when Hill, accompanied by Willis and T.Y., "came shooting."   She testified that she knew Willis and Hill from the recreation center, where she would see them playing basketball.     She identified both boys in the courtroom.

{¶9} Destiny testified that she saw a gun in Hill's hand and saw fire coming from the front of the gun, pointing down towards where she, Lindsey, and Donner were standing, approximately ten feet away.   She testified that Willis and T.Y. were standing next to Hill, facing towards her, and that she did not see either Willis or T.Y. holding a gun.   Based on the way in which she and the others were positioned, Destiny testified

that if Willis had had a gun, she believed she would have seen it. She stated that, in her mind, there was only one shooter, Hill.

{¶10} Destiny testified that she heard two gun shots. To her knowledge, no one was struck by the bullets, but one hit a gate a few inches away from where she, Lindsey, and Donner were standing. Destiny testified that after the shooting began, Donner pushed her towards her house and told her to leave. Destiny turned around and ran home quickly. When she arrived, her mother was already there. Destiny testified that she spoke with police after the incident but was never asked to prepare a written statement.

{¶11} Danielle's son, sixteen-year-old Lindsey Baldwin, similarly testified that he knew Willis and Hill from the recreation center, where he had played basketball with them. Lindsey testified that at approximately 5:00 p.m. on the day of the incident, he was walking home from the recreation center with a boy named Marquel when he was hit from behind. Lindsey testified that he did not know who hit him but that Hill and another boy, Joseph, were there and were holding him down. Lindsey testified that later that evening, he learned that Hill was at the store fighting Marquel, so he, Destiny, and Donner went up the hill to the store. Lindsey testified that by the time they arrived, the fight was over. He saw Hill ran past them, "toward the high rise." Lindsey testified that when he next saw Hill, approximately five minutes later, Hill was running towards him down the hill, shooting. Lindsey testified that he saw a gun in Hill's hand and that Hill was shooting towards the area where he, Destiny, Donner, and "a lot" of others were

standing. Lindsey further testified that Willis and "Tyrone" were with Hill and that Willis also had a gun and was shooting in his direction. Lindsey testified that they "were about a dumpster apart" from where they boys were shooting on the corner of Washington Avenue, but that he believed they were further away from Hill than his sister had testified when the shots were being fired. Lindsey testified that he heard three gun shots. He testified that no one was shot, but that a bullet hit a fence approximately three feet to the left of where he and the others were standing. When the shooting started, Lindsey ran home. Hill and Willis then ran down the hill away from Lindsey.

{¶12} On cross-examination, Lindsey admitted that there was "bad blood" between him and Hill and Willis, i.e., he did not like them and they did not like him. Although Lindsey had originally testified on direct examination that he could see Hill's and Willis's faces despite the darkness, on cross-examination, he later acknowledged that he could not see their faces as they were shooting but knew who was shooting at him because he knew "how they walked and stuff." Lindsey also admitted that he gave a written statement to police the day after the incident in which he indicated that only Hill had been shooting at him. Despite acknowledging that the information "would have been important," Lindsey could not state why he did not mention, in the written statement he gave police, that Willis had been shooting at him as well.[2]

---

[2] It is not entirely clear from the record whether Lindsey, in fact, failed to mention in his written statement to police that Willis was also shooting at him. A copy of the statement is not in the record. On re-direct examination, however, the prosecutor asked Lindsey to read a line from the statement, which suggests that Lindsey may have stated that Willis had also been shooting at him: "Walking down the street toward us when *Marcus and Dionta started shooting* at us." (Emphasis

**{¶13}** Nataia Ogletree ("Ogletree"), age 19, also witnessed the incident. She testified that she first saw Hill, Willis, and T.Y. that evening when Hill and Marquel were involved in "a little tussle" at the corner store. She testified that she did not see Lindsey, Destiny, or Donner at the store at that time. She testified that she knew Willis because Ogletree and Willis's sister had been involved in "altercations" several years earlier. She denied, however, that any "bad blood" continued to exist between the two women. Ogletree testified that she was also familiar with Hill and knew him from "just seeing him" around the neighborhood.

**{¶14}** Ogletree testified that after the altercation at the store, she and several others were walking back towards her grandmother's house on Washington Avenue when Hill told them, "wait right there," and ran down the hill. At this time, Willis was "still towards the store." Ogletree testified that she and her companions continued to walk toward Washington Avenue. A minute or two later, as they approached 2834 Washington Avenue, Ogletree testified she heard gunshots coming from behind her from the corner. She and "a lot" of others who were standing in the area took off running. She testified that she and Danielle hurried to get the young children who were in the area inside away from the gunfire. Ogletree testified that she did not see the gunfire or who was shooting and did not recall how many shots she heard. She further testified that she gave a statement to police following the incident in which she stated that Willis was wearing a red polo hat, red shirt, and khakis that evening.

added.)

{¶15} In addition to the testimony from eyewitnesses, the state presented testimony from several police officers, including Lorenzo Brazzell, a patrol officer with the Cuyahoga County Metropolitan Housing Authority ("CMHA") Police Department, and Sergeant Richard Schilling and Detective Kyle White, also with the CMHA Police Department — all of whom responded to the call about the shooting.

{¶16} Brazzell testified that he had been assigned to the 2 p.m. to 10 p.m. shift and had responded to an assault call earlier that evening involving Lindsey. Brazzell testified that he spoke with Hill regarding the alleged assault and that Hill acknowledged being present during the assault, but denied knowing who hit Lindsey. Brazzell testified that when he spoke with Hill about the alleged assault, Hill was wearing a blue shirt and khaki pants.

{¶17} Brazzell testified that, later that evening, he was one of several police officers who responded to a call regarding shots having been fired on Washington Avenue. Brazzell testified that when he arrived on the scene, he saw six to ten people "in a slight panic." He conducted interviews of several eyewitnesses, including Danielle and Ogletree, and testified that, with respect to potential suspects, Hill and Willis were identified by name as having been involved in the incident. He testified that the witnesses also provided descriptions of two males who were allegedly involved in the incident — one in a blue shirt and khaki pants and one in a red or grey shirt with a hoodie and cargo or khaki pants. After speaking with the victims, Brazzell conducted a patrol of the surrounding area. Less than 100 yards from the scene of the incident, Brazzell

observed a person who appeared to match the description of one of the suspects and stopped him. It was Willis. Brazzell testified that he became suspicious of Willis after Willis agreed to speak with him, but could not provide clear answers to the officer's questions regarding his comings and goings. After confirming over the police radio that Willis matched the description given by eyewitnesses of one of the males involved in the incident, Brazzell handcuffed Willis and placed him in his police car for further investigation. Willis had no weapon, ammunition, or other contraband with him at the time he was detained. Brazzell testified that Willis was then brought back to the scene, where witnesses identified him as one of the individuals involved in the incident. Willis was thereafter arrested for felonious assault. A gunshot residue test performed on Willis's hands thirty or forty minutes after the shooting came back negative.

{¶18} CMHA Sergeant Schilling and CMHA Detective Kyle White were also involved in the on-site investigation. Detective White testified that they located and collected four spent .40 caliber shell casings at the scene. Sergeant Schilling believed that the casings they found were nine millimeter shell casings, but explained that nine millimeter and .40 casings could be fired from the same gun. Detective White further testified that no gun was located at the scene and that a .40 caliber bullet could not be shot from a .22 caliber gun.

{¶19} Martin Lewis, a forensic scientist in the trace evidence section of the Attorney General's Office, Bureau of Criminal Identification and Investigation, testified regarding gunshot residue tests he performed on a jacket belonging to Hill. He testified

that the tests came back negative. Lewis explained, however, that a negative gunshot residue test does not necessarily mean that someone did not fire a gun. He explained that gunshot residue has a limited ability to be detected and that there are a number of variables that impact whether gunshot residue will be found following a shooting, including the type of firearm used, the number of shots fired, the type of ammunition, the length of time since the shooting, the level of activity since the shooting, and weather and wind currents. He explained that gunshot residue generally remains on the surface of a person's hands for up to four to six hours. He further explained that gunshot residue deposited on a surface "falls off" over time; physical activity, contact with other items, and movement can cause gunshot residue to fall off.

{¶20} CMHA Detective Leon Justus was assigned to conduct the follow-up investigation following the incident. He testified that, as part of his investigation, he spoke with Danielle, reviewed the first statement she gave at the scene of the incident with her, and then asked her to write out another statement. He also spoke with Lindsey, Destiny, and several others regarding the incident. Justus thereafter obtained a search warrant for Hill's apartment where officers recovered a .22 caliber revolver out of Hill's closet and six rounds of .22 ammunition in a dresser. Justus testified, however, that the .22 caliber ammunition and revolver found in Hill's home did not match the .40 caliber shell casings found at the scene. After Justus executed the search warrant, Hill was arrested.

{¶21} Neither Hill nor Willis presented any witnesses in their defense.

{¶22} On February 21, 2013, the trial court returned guilty verdicts against Hill on all three felonious assault counts, along with the corresponding one-year and three-year firearm specifications. As to the attempted murder charges, the trial court found Hill not guilty. The trial court acquitted Willis of all charges.

{¶23} On March 25, 2013, the trial court sentenced Hill to an aggregate prison term 6 years — three years on each of the felonious assault charges, to be served concurrently to one another, and three years on the firearm specifications, to be served consecutively with the three-year sentence on the felonious assault charges.

{¶24} Hill appeals his convictions, raising a single assignment of error:

> The defendant's convictions are against the manifest weight of the evidence.

{¶25} A manifest weight challenge questions whether the state met its burden of persuasion at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). When a conviction is challenged on appeal as being against the manifest weight of the evidence, the reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶26}** In considering a manifest weight challenge, this court must remain mindful that the credibility of the witnesses and the weight to be given the evidence are primarily for the trier of fact to assess. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner, demeanor, gestures, and voice inflections, in determining whether the proffered testimony is credible. *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, ¶ 26, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24; *see also State v. Lilliard*, 8th Dist. Cuyahoga Nos. 99382, 99383, and 99385, 2013-Ohio-4906, ¶ 93 (In considering the credibility of witnesses on a manifest weight challenge, appellate court is "guided by the presumption" that the jury, or the trial court in a bench trial, is "'best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'"), quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin, supra*.

**{¶27}** In support of his manifest weight challenge, Hill argues that his convictions are inconsistent with the trial court's acquittal of his codefendant, Willis, on the same charges. Hill also contends that his convictions should be overturned due to (1) the absence of a weapon or any forensic evidence linking him to the shooting, (2)

contradictions in the witnesses' testimony regarding the number of shooters, who was shooting, and how many shots were fired, (3) discrepancies between the witnesses' trial testimony and their written statements to police, and (4) evidence of the "bad blood" between Lindsey and Hill and Willis.   These arguments do not persuade us that Hill's convictions were against the manifest weight of the evidence.

{¶28} R.C. 2903.11(A)(2) provides in relevant part:

No person shall knowingly * * * [c]ause or attempt to cause
        physical harm to another * * * by means of a
        deadly weapon or dangerous ordnance.

"A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.   A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶29} Under R.C. 2929.14(B)(1)(a), a one-year mandatory prison term shall be imposed if the offender had "a firearm on or about the offender's person or under the offender's control while committing the felony" or a three-year mandatory prison term shall be imposed if the offender had "a firearm on or about the offender's person or under the offender's control while committing the offense and display[ed] the firearm, brandish[ed] the firearm, indicat[ed] that the offender possessed the firearm, or us[ed] it to facilitate the offense."   *See also*   R.C. 2941.141, 2941.145.

{¶30} The acquittal of Willis on all charges does not warrant the conclusion that Hill's conviction on the same charges was against the manifest weight of the evidence.

First, the state's evidence was stronger against Hill than against Willis. Destiny testified unequivocally that although she clearly saw Hill, approximately ten feet away, shooting at her and others that evening, she was certain she never saw Willis with a gun. Although she knew Willis and what he was wearing the night of the incident, Ogletree did not see Willis shooting at her. With respect to Danielle and Lindsey's testimony identifying Willis as one of the shooters, certain aspects of their testimony were called into question during cross-examination, including purported inconsistencies between their trial testimony and the written statements they gave police shortly after the incident, which, at times, did not clearly identify Willis as one of the shooters. As a result, the trial court may have found Danielle and Lindsey's testimony identifying Willis as one of the shooters less credible than Destiny's contrary testimony.

{¶31} Further, the state presented evidence that Willis was picked up walking along the neighborhood streets shortly after the incident. Gunshot residue tests performed on Willis's hands thirty to forty minutes after the shooting came back negative. Forensic expert Martin Lewis testified that he would generally expect gunshot residue to remain on a shooter's hands for four to six hours after a shooting. The fact that these tests came back negative, combined with the conflicting witness testimony regarding Willis's role in the incident, supports the trial court's reasonable doubt as to whether Willis "knowingly * * * [c]ause[d] or attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

**{¶32}** Whereas there was conflicting testimony regarding whether Willis was one of the shooters, all of the witnesses consistently identified Hill as a shooter. Danielle, Lindsey, and Destiny each testified that they knew Hill (by name or facial recognition) and that they saw fire coming from a gun Hill held in his hand as he pointed the gun towards Lindsey, Destiny, Donner, and others standing nearby. Accordingly, we do not believe the verdicts were inconsistent. *See, e.g., State v. Eppard,* 6th Dist. Lucas No. CL 05-1279, 2007-Ohio-2257, ¶ 16 (wife's conviction for grand theft based on alleged authorized payments from little league account to herself and codefendant husband was not improper, notwithstanding husband's acquittal on an identical charge, where state's evidence was stronger against wife); *State v. Mounts,* 12th Dist. Brown No. CA97-02-007, 1998 Ohio App. LEXIS 1078, *12 (Mar. 23, 1998) (verdicts convicting wife and acquitting codefendant husband of filing false report of child abuse or neglect were not inconsistent where trier of fact could reasonably find that roles of appellant and codefendant in the conduct at issue differed and that the "motive and credibility" of the two "parted in many respects").

**{¶33}** Further, even assuming arguendo that the verdicts against Hill and acquitting Willis were inconsistent, "inconsistent verdicts between co-defendants is not a sufficient reason for reversing a conviction." *See, e.g., Eppard* at ¶ 16; *Mounts* at *12, citing *Dunn v. United States,* 284 U.S. 390, 394, 52 S.Ct. 189, 76 L.Ed. 356 (1932), and *United States v. Dotterweich*, 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48 (1943).

{¶34} Nor does the absence of a weapon or forensic evidence tying Hill to the shooting warrant overturning Hill's convictions, where, as here, credible eyewitness testimony identified Hill as one of the shooters. *See, e.g., State v. Torres*, 8th Dist. Cuyahoga No. 99596, 2013-Ohio-5030, ¶ 95 (defendant's convictions were not against the manifest weight of the evidence where, although there was no forensic evidence tying defendant to victim, "substantial testimonial and circumstantial evidence" supported jury's verdict); *State v. Taylor*, 10th Dist. Franklin No. 12AP-870, 2013-Ohio-3699, ¶ 47 (although no weapon or forensic evidence tied appellant to the shooting, conviction was not against the manifest weight of the evidence where one of the victims identified appellant as the shooter); *State v. Warren*, 8th Dist. Cuyahoga No. 95671, 2011-Ohio-4633, ¶ 27, 33-35 (rejecting appellant's argument that evidence weighed heavily against his conviction because no gun was found and no forensic evidence was presented linking him to the crime, where witnesses testified that appellant had a small silver gun he had used to rob the victims and then shot at one of the victims); *State v. Jordan*, 10th Dist. Franklin No. 04AP-827, 2005-Ohio-3790, ¶ 14-15 (where eyewitness, familiar with defendant, identified defendant as the shooter, absence of weapon or forensic evidence tying defendant to the shooting did not support reversal of conviction on manifest weight grounds).

{¶35} Likewise, inconsistencies among the witnesses' testimony or purported discrepancies between the witnesses' statements to police and their trial testimony are not a sufficient basis to overturn Hill's convictions on manifest weight grounds.

Admittedly, there were inconsistencies among the witnesses regarding what they saw and heard that evening. For example, the witnesses disagreed as to who was shooting — whether it was just Hill or Hill and Willis — as to the number of gunshots fired — two shots, three shots, or five or six shots— and as to the distance between the witnesses and the shooter(s) when the shooting occurred — ten feet, the distance from the witness stand to the outside doors of the courtroom, or further away. There were also various alleged discrepancies between Danielle and Lindsey's trial testimony, the 911 call Danielle made after the incident, and the written statements Danielle and Lindsey each gave to police. However, despite the variations in their testimony, each of the witnesses clearly and consistently identified Hill as a shooter.

{¶36} Danielle, Lindsey, and Destiny each testified unequivocally that they heard gunshots and saw gunfire coming towards them from a gun held in Hill's hand. These witnesses further testified that they knew Hill by name (or, in the case of Danielle, facial recognition) from playing basketball at the recreation center or from seeing him around the neighborhood. They also testified that they saw Hill's face or otherwise recognized Hill from "how [he] walked and stuff" when Hill was shooting toward the crowd that evening. Hill was identified as a shooter in both Danielle's and Lindsey's witness statements and during the 911 call. Police detectives testified that four shell casings were recovered near the scene of the incident, corroborating the witnesses' testimony that a gun had been fired.

{¶37} "'A conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony.'" *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38, quoting *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11; *see also State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, *7 (May 28, 1996); *State v. Bridgeman*, 2d Dist. Champaign No. 2010 CA16, 2011-Ohio-2680,

¶ 35-42 (fact that evidence "is subject to different interpretations does not render the conviction against the manifest weight of the evidence"), citing *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14. "'In reviewing the 'manifest weight of the evidence, * * * even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable [factfinder] could find the eyewitness testimony to be credible.'" *Taylor*, 2013-Ohio-3699 at ¶ 47, quoting *State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080, 963 N.E.2d 162 ¶ 35, (10th Dist.), quoting *Jordan*, 2005-Ohio-3790 at ¶ 14.

{¶38} Hill highlights various issues with Lindsey's testimony, in particular, that he claims makes him an unbelieveable witness. However, "'[i]t is the province of the [trier of fact] to determine where the truth probably lies from conflicting statements, not only of

different witnesses but by the same witness.'" *State v. Jennings*, 10th Dist. Franklin No. 09AP-70, 2009-Ohio-6840, ¶ 56, quoting *State v. Haynes*, 10th Dist. Franklin No. 03AP-1134, 2005-Ohio-256, ¶ 24.

{¶39} Nor does the fact that there was "bad blood" between Lindsey and Hill warrant overturning his convictions. The animosity between Lindsey and Hill and any motive on the part of Lindsey or his family members to testify untruthfully was simply one fact for the court to consider in evaluating the credibility of the witnesses' testimony.

{¶40} The trial court, as the trier of fact in this case, was in the best position to weigh the evidence and the witnesses' credibility. It was entitled to believe or disbelieve all, part, or none of a witness's testimony. *Torres*, 2013-Ohio-5030 at ¶ 93, citing *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21. After examining the entire record, we cannot say that the trial court lost its way or created a manifest miscarriage of justice in convicting Hill of felonious assault and the related firearm specifications. The state's case contained substantial testimonial evidence upon which the trial court could reasonably conclude, beyond a reasonable doubt, that Hill was one of the shooters and that he "knowingly * * * attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance," had "a firearm on or about [his] person or under [his] control while committing the [offense]," and "display[ed] the firearm, brandish[ed] the firearm, indicated that [he] possessed the firearm, or us[ed] [the firearm] to facilitate the offense" to warrant his convictions for felonious assault in violation of R.C. 2903.11(A)(2) and the corresponding one-year and

three-year firearm specifications under R.C. 2941.141(A) and 2941.145(A). R.C. 2929.14(B)(1)(a); *State v. Pruitt*, 8th Dist. Cuyahoga No. 98080, 2012-Ohio-5418, ¶ 18 ("[W]eight of the evidence and the credibility of witnesses are primarily for the trier of fact and a reviewing court

must not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the state has proven the offense beyond a reasonable doubt."), citing *DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 at paragraphs one and two of the syllabus. Accordingly, Hill's assignment of error is overruled.

**{¶41}** Hill's convictions are affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentences.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KENNETH A. ROCCO, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and

EILEEN T. GALLAGHER, J., CONCUR