[Cite as *State v. Sanders*, 2020-Ohio-5081.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108953 |
| v. | : | |
| GARY L. SANDERS, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 29, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-632701-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey Maver and Nora Bryan, Assistant Prosecuting Attorneys, *for appellee.*

Edward M. Heindel, *for appellant.*

RAYMOND C. HEADEN, J.:

{¶ 1} Defendant-appellant Gary L. Sanders ("Sanders") appeals from his convictions for involuntary manslaughter, felonious assault, and having weapons while under disability. For the reasons that follow, we affirm.

## Procedural and Substantive History

{¶ 2} On October 30, 2018, the Cuyahoga County Grand Jury indicted Sanders on one count of murder in violation of R.C. 2903.02(A), one count of murder in violation of R.C. 2903.02(B), one count of involuntary manslaughter in violation of R.C. 2903.04(A), one count of felonious assault in violation of R.C. 2903.11(A)(1), one count of carrying a concealed weapon in violation of R.C. 2923.12(A)(2) with a furthermore specification, one count of having weapons while under disability in violation of R.C. 2923.13(A)(3), and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2). The first four counts carried three-year firearm specification.

{¶ 3} Sanders initially entered a plea of not guilty to all charges. On June 24, 2019, Sanders waived his right to a jury trial on the having weapons while under disability charges, and a jury trial on all other counts and specifications began.

{¶ 4} These charges arose from a shooting that took place at approximately 5:25 p.m. on February 23, 2018. Earlier that afternoon, Charles Calhoun ("Calhoun") was smoking crack cocaine in his apartment with Jennifer McMillan ("McMillan"). Calhoun testified at trial that around the time of the incident in this case, Sanders would sometimes stay at his apartment and regularly kept some of his belongings there. Calhoun also testified that he used to sell crack out of his apartment, and several months before the shooting in this case, his apartment was raided.

{¶ 5} McMillan testified at trial that at the time of the incident, she was addicted to crack and regularly prostituted herself. Earlier in the afternoon on February 23, McMillan testified that she had gotten into an altercation with a man with whom she had a prostitution arrangement, and then arrived at Calhoun's apartment at around 4:40 p.m. The victim, Phylicia Mitchell ("Mitchell"), was present at the apartment when McMillan arrived. Shortly before 5 p.m., Sanders arrived at the apartment.

{¶ 6} Sanders, who had been arguing with Mitchell over the phone for several minutes before he arrived at the apartment, started arguing with Mitchell upon arriving. Sanders accused Mitchell of taking a gift card from him, and Mitchell denied this. While Sanders and Mitchell were arguing, Robert Flores ("Flores"), and James Watkins ("Watkins") arrived separately at the apartment. McMillan testified that Sanders ultimately started to choke Mitchell. McMillan went on to testify that Sanders went to a closet where he had previously kept some of his belongings and then appeared to have a small silver gun. At this point, according to McMillan, Flores and Watkins ran out the back door of the apartment.

{¶ 7} A physical struggle between Sanders and Mitchell ensued, causing McMillan to run into the dining room. When McMillan and Calhoun were in the dining room, and Calhoun yelled at Sanders and Mitchell to stop fighting, McMillan testified that she heard a gunshot, and the struggle between Sanders and Mitchell continued for a short time after she heard the shot. McMillan also testified that when she was hiding in the dining room, she heard Mitchell say, "I've been shot, I'm

dying." According to McMillan, Sanders came into the dining room, said, "I wasn't here," and then left through the front door. McMillan testified that she called 911 while Calhoun went to Mitchell and tried to hold her up.

{¶ 8} Calhoun's testimony largely corroborated McMillan's testimony summarized above. Calhoun testified that he and McMillan were in his bedroom near the back of the apartment when they heard gunshots. Several minutes later, he went into the front room and saw that Mitchell had been shot. He told McMillan to call 911 and attempted to hold Mitchell and calm her down. Calhoun also testified that at some point, McMillan's 911 call ended and dispatch called back and spoke with him. Calhoun testified that he did not tell the police about Sanders's argument with Mitchell because he was shocked, he was afraid that Sanders would come and shoot him, and he did not want anyone to say that he was a snitch. Calhoun also testified that he heard Sanders repeatedly say, "oh shi*" in the living room, and he confirmed that he saw Sanders leave the apartment. Calhoun could not confirm which door Sanders went through, and he testified that he had not seen him with a gun at any point that day.

{¶ 9} Calhoun also testified that he had been asleep for most of the day prior to the shooting, and he started smoking crack when he woke up, so he was not sure how long Sanders had been in the apartment prior to the shooting. Calhoun testified that later that day, Sanders called him and asked what was going on. Calhoun responded that someone had shot Mitchell and then ended the call. Subsequently, Calhoun spoke with Shane Mitchell ("Shane"), Mitchell's boyfriend.

Calhoun testified that Shane told him that Sanders had reached out to Shane and said that Mitchell tried to take his gun from him during their argument when it went off. At trial, Shane testified that he and Mitchell had known each other since 1988, and he was one of the first people Mitchell met in Cleveland. Shane testified that Mitchell had legally changed her last name because they had plans to marry eventually.

{¶ 10} During a second interview with police when he was in prison, Calhoun reviewed photographs and surveillance footage and identified Sanders and Watkins.

{¶ 11} Watkins testified that earlier in the day on February 23, 2018, he had gone to Calhoun's house to buy drugs. According to Watkins, when he left the apartment, Calhoun, McMillan, Sanders, and Mitchell remained at the apartment. Shortly before 5:30 p.m., Watkins testified that he received a call from Sanders, and then ran into him leaving the apartment and said that Sanders said he needed to go home so that he could "call his people." Surveillance footage from a camera near Calhoun's apartment showed Sanders and Watkins walking toward Watkins's apartment at 5:26 p.m., very shortly after the shooting. Watkins testified that when they got to his apartment, he left to go get drugs and Sanders was left to talk to Watkins's girlfriend, Louise Mays ("Mays"). Watkins testified that while he had previously seen Sanders with a small gun, he did not see Sanders with a gun that day.

{¶ 12} At trial, Mays testified that she and Watkins regularly use crack cocaine, and she had been addicted for decades. She testified that she was not at

Calhoun's when Mitchell was killed because she was with Watkins in the apartment they shared, but she heard about the incident. Mays testified that at some point on the afternoon of February 23, 2018, Watkins left to go to the corner store and then returned with Sanders. According to Mays, she knew Sanders and had often seen him at Calhoun's apartment, but this was the first time she had seen him in her apartment. She testified that Sanders appeared nervous. Mays offered Sanders a coat, and he left the apartment. Several hours later, Mays heard that someone had shot Mitchell.

{¶ 13} During the state's direct examination of Mays, the following exchange took place:

> PROSECUTOR: Do you remember talking to Cleveland Police about this case?
>
> MAYS: Yeah.
>
> PROSECUTOR: Do you remember telling them that you heard [Sanders] say, I f***ed up. I f***ed up?
>
> MAYS: No. I didn't hear him say that. I don't remember me saying — me saying that he f***ed up. I don't remember me saying that.
>
> PROSECUTOR: If I can play the video, would that refresh your recollection?
>
> MAYS: Can you? You can go ahead. But if I said that, then I said that he f***ed up. He probably did say that though. It was — how many months ago was this, of me saying that he said he f***ed up?

The state then requested to play the footage of Mays's March 2019 interview with the police in an attempt to refresh her recollection. Defense counsel objected, and the trial court overruled the objection. The video was played outside of the presence

of the jury, and then the state resumed direct examination in the presence of the jury.

{¶ 14} Mays confirmed that upon reviewing the video, her recollection was refreshed. She went on to testify that when Sanders was at her apartment, he was pacing back and forth and saying that he messed up and needed to "call his people." During defense counsel's cross-examination of Mays, she testified that she has schizophrenia and at the time of her interview in this case, she was not taking her medication.

{¶ 15} EMS arrived at the apartment and tested McMillan and Calhoun for gun residue. Detectives arrived at the scene and collected a spent .22 caliber shell casing. No weapon was recovered from a search of the apartment.

{¶ 16} Responding Police Officer Darin Gessino ("Officer Gessino") testified at trial. The state also introduced footage from his body camera into evidence. Officer Gessino arrived at the scene at 5:37 p.m. and observed Mitchell slumped over in the living room and Calhoun and McMillan sitting on the couch. While Officer Gessino secured the scene, EMS were attempting to assist Mitchell and his partner took Calhoun and McMillan into another room. Officer Gessino testified that when EMS removed Mitchell's sweatshirt, he observed both the gunshot wound and burn marks on the shirt that could indicate that Mitchell was shot at close range.

{¶ 17} The state also called Tom Ciula ("Ciula"), a forensic video specialist with the Cleveland Police, to testify at trial. Ciula testified that he analyzed surveillance footage from the investigation in this case and prepared a report. Ciula

testified that he put together a list of suspects in this case based on his analysis of surveillance footage from a corner store and city video cameras.

{¶ 18} Next, the state called Lisa Przepyszny ("Przepyszny"), a forensic scientist in trace evidence, who testified that she collected gunshot residue from Mitchell's hands and collected swabs from her fingernails. Przepyszny also testified that she examined gunshot residue kits that had been collected from Calhoun and McMillan. She testified that based on her analysis, Mitchell was likely shot at close range. Finally, she testified that Calhoun and McMillan both had gunshot residue on their hands, which could mean that they had fired a gun, were in close proximity to a fired gun, or handled an object that had gunshot residue on it.

{¶ 19} Cleveland Police Detective Walter Emerick ("Detective Emerick") testified that on February 23, 2018, he responded to a call for a homicide at Calhoun's apartment around 7 p.m. Detective Emerick testified that officers had received a search warrant for the apartment, and he subsequently took photos of the scene and marked and collected evidence. He testified that he recovered a spent cartridge casing in the living room, on the floor between the couch and the coffee table. Detective Emerick also collected cell phones. Finally, he testified that he tested Calhoun and McMillan for gunshot residue.

{¶ 20} The state called Dr. Dan Galita ("Dr. Galita"), a forensic pathologist and medical examiner with the Cuyahoga County Medical Examiner's office. Dr. Galita testified that he conducted an autopsy of Mitchell and prepared a corresponding report. He testified that Mitchell suffered a gunshot wound in her

chest, and a small caliber bullet was recovered during the autopsy. The wound resulted in extensive internal bleeding. Dr. Galita testified that Mitchell died as a result of a gunshot wound to the chest, and the manner of death was a homicide.

{¶ 21} Calhoun and McMillan both testified that Flores was present at the time of the shooting. Prior to their testimony, the state was not aware of this fact and, therefore, did not include him on its witness list. Midway through the trial, the state informed the court and defense counsel that in response to learning of Flores's presence at the apartment, it had identified him and issued a subpoena for him to appear at trial. Defense counsel argued that because the state was only unaware of Flores's identity as a result of its own failure to investigate, the court should not allow Flores to testify at trial. The parties were able to question Flores outside of the presence of the jury. Flores testified that he regularly bought drugs from Sanders and Calhoun. On February 23, 2018, he was at Calhoun's apartment to buy drugs from Sanders. Flores testified that he was in the dining room when a fight broke out between Sanders and Mitchell. Flores testified that Calhoun and McMillan were also in the apartment at this time. Flores testified that he heard gunshots, saw that Mitchell had been shot, and "took off for fear" of his life. He testified that he had not seen Sanders with a gun that day.

{¶ 22} Following this voir dire, the state called Flores as a witness to testify in the presence of the jury. After answering preliminary questions about his name and address, Flores stated that he wished to invoke his right not to testify pursuant to his Fifth Amendment right against self-incrimination. The court subsequently

instructed the jury that Flores invoked this privilege and thereby made himself unavailable as a witness. The court excused Flores as a witness and, subsequently, the court permitted the state to enter Flores's former testimony into the record over defense counsel's objection.

{¶ 23} At the close of the state's case, defense counsel made a Crim.R. 29 motion for acquittal as to all counts. The court denied Flores's motion.

{¶ 24} Defense counsel called Richard Cerny ("Cerny") as a witness. Cerny is an investigator with the Cuyahoga County Public Defender's office. Prior to that position, he worked for the Cleveland Division of Police's accident investigation unit. Cerny testified that he timed himself walking from Calhoun's apartment to the point at which Sanders was identified on nearby surveillance footage and that it took two minutes and forty seconds. During closing arguments, defense counsel argued that based on the time at which Sanders was observed on the surveillance footage and the timing of the 911 calls, he had left Calhoun's apartment before Mitchell was shot.

{¶ 25} On July 8, 2019, the jury returned a verdict of guilty on the involuntary manslaughter and felonious assault counts and corresponding firearm specifications, and not guilty of the counts of murder and carrying a concealed weapon. The trial court found Sanders guilty of both counts of having weapons while under disability.

{¶ 26} Sanders filed a motion for a new trial, primarily based on the Flores testimony. Following a hearing, the trial court denied this motion.

{¶ 27} On August 8, 2019, the court held a sentencing hearing. The court merged the involuntary manslaughter and felonious assault offenses for sentencing and merged the having weapons while under disability offenses for sentencing. The court proceeded to sentence Sanders to 10 years for involuntary manslaughter, 3 years for the firearm specification, and 30 months for having weapons while under disability. The court ordered the sentences to run consecutively for a total sentence of 15 years and 6 months.

{¶ 28} Sanders appeals, presenting the following assignments of error for our review:

> I. The trial court erred in the manner it permitted the state to refresh the recollection of Louise Mays about a conversation she had with the police more than a year after the crime.
>
> II. The trial court erred when it permitted the testimony of Robert Flores. The state did not disclose this witness prior to the start of trial.
>
> III. The trial court erred when it permitted Robert Flores to assert a Fifth Amendment privilege claim without further inquiry into the validity of the claim.
>
> IV. The trial court erred when it admitted the former testimony of Robert Flores after his faulty assertion of a Fifth Amendment privilege claim.
>
> V. The convictions were against the manifest weight of the evidence.
>
> VI. The convictions were not supported by sufficient evidence.

## Law and Analysis

## I.   Mays's Testimony

{¶ 29} In his first assignment of error, Sanders argues that the trial court erred in the manner by which it permitted the state to refresh the recollection of

Mays about her conversation with the police more than a year after the crime. Specifically, Sanders argues that because the recorded recollection was made approximately one year after the shooting, there are serious questions regarding the reliability of her initial statement. Further, Sanders argues that based on Mays's untreated schizophrenia and certain comments she made at the end of her testimony, her "refreshed recollection" was not reliable.

{¶ 30} A trial court has broad discretion over the admission of evidence. *State v. Conner*, 8th Dist. Cuyahoga No. 75773, 2000 Ohio App. LEXIS 884, 13 (Mar. 9, 2000), citing *State v. Long*, 53 Ohio St.2d 91, 98, 372 N.E.2d 804 (1978). An abuse of discretion implies that the court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 31} A party may refresh the recollection of a witness under Evid.R. 612 by showing the witness their prior statement while testifying. *State v. Webb*, 8th Dist. Cuyahoga No. 100487, 2014-Ohio-2644, ¶ 25. Under the doctrine of present recollection refreshed, the witness reviews the prior statement to refresh their memory, but then proceeds to testify from their present, independent knowledge. *Id.*, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 57, citing *State v. Scott*, 31 Ohio St.2d 1, 5-6, 285 N.E.2d 344 (1972).

{¶ 32} Here, the witness remembered being interviewed by the police at her apartment following the shooting, but it was established that at the time of trial, she did not remember exactly what she told the police that Sanders had said at her

apartment. This sufficiently established that Mays lacked a present recollection of her statement to the police. Her recollection was then refreshed when she viewed the footage of her statement to the police, and she testified as to what she told police that Sanders said when he was at her apartment. The way in which Mays's testimony was elicited was in accordance with Evid.R. 612.

{¶ 33} Sanders argues that Mays's initial statement was not reliable pursuant to Evid.R. 803(5), which provides a hearsay exception for recorded recollection as follows:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown by the testimony of the witness to have been made or adopted when the matter was fresh in his memory and to reflect that knowledge correctly.

{¶ 34} Upon seeing the video, Mays confirmed that her recollection was refreshed. Sanders argues that because Mays's interview in this case took place approximately one year after the incident, and her schizophrenia was untreated when she gave that statement, it does not meet the Evid.R. 803(5) standard for reliability. We are not persuaded.

{¶ 35} "Evid.R. 803(5) must be distinguished from Evid.R. 612, which permits a witness to refer to a writing to refresh his memory for the purpose of testifying." *Barhorst v. Sonoco Prods. Co.*, 2d Dist. Miami No. 96CA28, 1997 Ohio App. LEXIS 4190, 12 (Sept. 12, 1997). If evidence is admitted pursuant to Evid.R. 803(5), "the memorandum or record may be read into evidence." Evid.R. 803(5). Under Evid.R. 612, however, the evidence in issue is the witness's

testimony at trial rather than their recorded recollection. We acknowledge Sanders's argument that the rules are analogous. Because the evidence in question does not consist of Mays's past recollection, however, Sanders's attempt to question the reliability of a statement not in evidence is not persuasive.

{¶ 36} Further, the essence of Sanders's argument that Mays's initial statement to the police was not reliable is her untreated schizophrenia. Evid.R. 601(A) provides that every person is competent to be a witness except as otherwise provided in these rules. The argument that Mays's testimony included "bizarre comments" indicative of schizophrenia does not on its own indicate that either her 2019 statements to the police or her trial testimony was unreliable. Moreover, Sanders has not shown that admission of this testimony constituted an abuse of discretion. Therefore, Sanders's first assignment of error is overruled.

## II. Flores's Testimony

{¶ 37} Sanders's second, third, and fourth assignments of error all concern the Flores testimony. For ease of discussion, we will address them together. Sanders argues that the trial court erred by permitting Flores to testify in general, permitting him to assert a Fifth Amendment privilege claim, and admitting his voir dire testimony after he asserted privilege.

### A. Discovery Violation

{¶ 38} Sanders's initial argument is that because the state committed a discovery violation by failing to disclose Flores as a witness until midway through trial. According to Sanders, the state knew, or should have known, about Flores's

involvement in the case months before trial when they received surveillance video evidence showing Flores. According to the state, none of their witnesses mentioned that Flores was present in the apartment at the time of the shooting until McMillan and Calhoun testified to that effect at trial.

{¶ 39} Crim.R. 16(I) provides that "each party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal." Crim.R. 16(L)(1) provides that where a trial court has determined that a party has committed a discovery violation, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."

{¶ 40} While a trial court has broad discretion in regulating discovery and determining a discovery violation, the court must impose the least severe sanction consistent with the purpose of the rules of discovery when it determines that a discovery violation has occurred. *State v. Brown*, 2019-Ohio-1235, 134 N.E.3d 783, ¶ 86 (8th Dist.), citing *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 33, *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), paragraph two of the syllabus, and *State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81 ¶ 20 (8th Dist.). Specifically, in determining the appropriate sanction, a trial court must consider three factors: (1) whether the failure to disclose was a willful violation of Crim.R. 16; (2) whether foreknowledge of the undisclosed material would have

benefitted the accused in preparation of a defense; and (3) whether the accused was prejudiced. *Id.* at ¶ 87.

{¶ 41} Upon review of the record, it is not clear that the state willfully failed to disclose Flores as a witness. While Sanders argues that the state knew, or should have known, that Flores was present at Calhoun's house the day of the shooting, this argument is not supported by the record. According to Sanders, the state should have known or ascertained the identity of an unidentified individual walking down the street near Calhoun's apartment and determined that this individual was present at the shooting. We cannot conclude that what may have been a failure to thoroughly investigate the identity of an additional witness was a willful discovery violation.

{¶ 42} Moreover, it is not clear from the record that foreknowledge of the state's intention to call Flores as a witness would have benefitted Sanders, or that he was prejudiced by the late disclosure. Although Sanders argues that defense counsel was surprised by the late disclosure, the record reflects that the video footage he argues should have alerted the state to Flores's value as a witness was turned over to Sanders's defense in December 2018. Further, the record reflects that through interviewing witnesses in the case before trial, defense counsel learned that an individual named Robert was at Calhoun's apartment prior to the shooting. Defense counsel also had photos of Flores marked as exhibits in preparation for trial. All of this indicates that foreknowledge of the state's intention to call Flores as a witness would not have significantly benefitted the preparation of Sanders's defense.

**{¶ 43}** Similarly, Sanders has not sufficiently shown that he was somehow prejudiced by the late disclosure. In addition to the foregoing, we note that Flores's version of events largely mirrored that of other witnesses, such as Calhoun and McMillan. A defendant is not prejudiced when an undisclosed witness's testimony is cumulative to what has already been testified or does not come as a surprise to the defense. *Brown*, 2019-Ohio-1235, 134 N.E.3d 783, at ¶ 87, citing *State v. Thomas*, 8th Dist. Cuyahoga No. 81393, 2003-Ohio-2648, ¶ 12.

**{¶ 44}** Finally, we note that in response to the late disclosure, the court provided defense counsel an opportunity to examine Flores outside of the presence of the jury. Even if the state committed a discovery violation, this remedy was appropriate. Because the trial court did not commit an abuse of discretion in allowing Flores to testify, Sanders's second assignment of error is overruled.

### B. Flores's Fifth Amendment Privilege

**{¶ 45}** In his third assignment of error, Sanders argues that the trial court erred when it permitted Flores to assert a Fifth Amendment privilege claim without conducting a further inquiry into the validity of the claim. The privilege against self-incrimination is accorded liberal construction in favor the right it was intended to secure. *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 31, citing *Counselman v. Hitchcock*, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), *overruled in part on other grounds*, *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**{¶ 46}** Further, this court and the Ohio Supreme Court have repeatedly held that an appellant lacks standing to challenge the trial court's actions regarding another person's assertion of his Fifth Amendment privilege against self-incrimination because that privilege is personal in nature. *Arnold* at ¶ 35; *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2017-Ohio-649, ¶ 10, citing *State v. Ramjit*, 8th Dist. Cuyahoga No. 77337, 2001 Ohio App. LEXIS 562 (Feb. 15, 2001). Because Sanders does not have standing to challenge the trial court's determination regarding a witness's Fifth Amendment privilege, his third assignment of error is overruled.

## C. Admission of Flores's Voir Dire Testimony

**{¶ 47}** In Sanders's fourth assignment of error, he argues that, upon determining that Flores was an unavailable witness pursuant to Evid.R. 804(A) based on the invocation of his Fifth Amendment privilege, the trial court erred in admitting Flores's former testimony pursuant to Evid.R. 804(B)(1).

**{¶ 48}** Evid.R. 804(A)(1) provides that a witness may be deemed unavailable when they are "exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement." Likewise, Evid.R. 804(B) provides that certain forms of testimony are not excluded by the hearsay rule if the declarant is unavailable as a witness. Specifically, Evid.R. 804(B)(1) provides that former testimony is not excluded, defining "former testimony" as:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law

in the course of the same or another proceeding, if the party against whom the testimony is not offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. Testimony given at a preliminary hearing must satisfy the right to confrontation and exhibit indicia of reliability.

Sanders argues that because the former testimony in question here was the result of a voir dire of Flores. Therefore, he argues that he did not have the motive to develop the testimony on cross-examination.

{¶ 49} We reiterate that because the trial court has broad discretion to admit or exclude evidence, its evidentiary decisions will not be disturbed on appeal absent an abuse of discretion and a showing of material prejudice. *State v. Ortiz-Vega*, 8th Dist. Cuyahoga No. 107694, 2019-Ohio-2918, ¶ 52, citing *State v. Hart*, 2018-Ohio-3272, 118 N.E.3d 454, ¶ 28 (8th Dist.), citing *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43.

{¶ 50} Sanders does not dispute that he had the opportunity to question Flores in a prior proceeding before he was declared unavailable. According to Sanders, though, the purpose of questioning Flores during that prior proceeding was merely to achieve a basic understanding of his testimony before he testified in the presence of the jury. Sanders argues that the cross-examination of Flores was brief and cursory, and there was much more about which he could have been questioned. Finally, Sanders argues that Flores's former testimony was not reliable.

{¶ 51} Although we acknowledge that the initial cross-examination of Flores was brief, the relevant inquiry is not whether defense counsel effectively cross-examined the witness, but whether they had an opportunity to do so. *State v.*

*Howard*, 2d Dist. Montgomery No. 19413, 2003-Ohio-3235, ¶ 33, citing *State v. Madison*, 64 Ohio St.2d 322, 331, 415 N.E.2d 272 (1980).  Here, the record reflects that defense counsel was provided an adequate opportunity to cross-examine Flores.  Moreover, as discussed above, the substance of Flores's testimony regarding the shooting was largely cumulative.  As to Sanders's argument that Flores's former testimony was not reliable, he supports this argument by reiterating that it was elicited by a cursory cross-examination.  It is unclear how the length or intensity of questioning has any bearing on the reliability of the corresponding testimony.  The fact that defense counsel did not question Flores as to particular details about the incident does not render his testimony in response to questions they did ask unreliable.  Therefore, the trial court did not abuse its discretion in admitting Flores's former testimony into evidence.  Sanders's fourth assignment of error is overruled.

## III. Manifest Weight of the Evidence

{¶ 52} In his fifth assignment of error, Sanders argues that his conviction is against the manifest weight of the evidence.  Specifically, Sanders argues that there was no indication from the evidence that Sanders was assaulting Mitchell, or committing a separate felony, when the gun went off.  Therefore, Sanders argues that he should not have been convicted of involuntary manslaughter under R.C. 2903.04(A), which provides that "no person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."  Sanders also argues that

he should not have been convicted of having weapons while under disability because the gun he allegedly used to shoot Mitchell was never recovered.

{¶ 53} A manifest weight challenge attacks the quality of the evidence and questions whether the state met its burden of persuasion at trial. *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387, ¶ 25, citing *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When reviewing a manifest weight challenge, a court reviews the entire record, weighing all evidence and reasonable inferences and considering the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 54} The record contains testimony from multiple witnesses that not only were Sanders and Mitchell arguing immediately prior to the shooting, but that they were engaged in a physical struggle that was initiated by Sanders. Further, the record contains evidence indicating that Mitchell was shot at close range, and surveillance footage showing Sanders outside of Calhoun's apartment immediately prior to McMillan calling 911 to report the shooting. All of this evidence supports the jury's finding that Sanders caused Mitchell's death when he shot her during a struggle that amounted to felonious assault.

{¶ 55} With respect to Sanders's conviction for having weapons while under disability, the record contains testimony from McMillan that she saw Sanders with a small gun almost immediately prior to the shooting. Testimony from Watkins that

he had previously seen Sanders with a small gun corroborates McMillan's testimony. Further, as discussed above, the evidence shows that Mitchell was shot at some point during her struggle with Sanders, and the record contains no evidence that anyone else was in the room at the time, let alone anyone carrying a weapon. Ohio courts have consistently held that a defendant may be convicted solely on the basis of circumstantial evidence. *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988), citing *State v. Kulig* 37 Ohio St.3d 157, 309 N.E.2d 897 (1974). Circumstantial evidence is equally probative as direct evidence. *Id.*, citing *State v. Griffin*, 13 Ohio App.3d 376, 377, 469 N.E.2d 1329 (1st Dist.1979). Here, there is ample evidence in the record supporting Sanders's conviction for having weapons while under disability.

{¶ 56} Therefore, we do not find that this is the exceptional case in which the jury lost its way. Sanders's convictions are not against the manifest weight of the evidence, and his fifth assignment of error is overruled.

## IV. Sufficiency of the Evidence

{¶ 57} In his sixth and final assignment of error, Sanders argues that his convictions were not supported by sufficient evidence. Sanders does not set forth an independent basis for this assignment of error and instead refers to the reasons set forth in his fifth assignment of error.

{¶ 58} App.R. 16(A) requires a party to separately argue each assignment of error. Pursuant to App.R. 12(A)(2), an appellate court may disregard any

assignment of error, or portion thereof, if the appellant fails to make a separate argument. *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 55.

{¶ 59} "Sufficiency" and "manifest weight" challenges present two distinct legal concepts. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 23. Unlike a manifest weight challenge, the test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, at ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. In light of our analysis in the foregoing assignment of error, we cannot conclude that Sanders's convictions were not supported by sufficient evidence. Therefore, Sanders's sixth assignment of error is overruled.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
RAYMOND C. HEADEN, JUDGE

PATRICIA ANN BLACKMON, P.J., and
MARY EILEEN KILBANE, J., CONCUR